IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CITY OF BIRMINGHAM RETIREMENT AND RELIEF SYSTEM, ROBERT L. REESE, POLICE RETIREMENT SYSTEM OF ST. LOUIS, EDWARD TANSEY, AND ESTATE OF LEATRICE SEINFELD, | § § § § § § § | |
| | § | No. 16, 2017 |
| Plaintiffs-Below, Appellants, | § § | Court Below: Court of Chancery of the State of Delaware |
| v. | § § | C.A. No. 9682-VCG |
| LYNN J. GOOD, ANN M. GRAY, G. ALEX BERNHARDT, SR., MICHAEL G. BROWNING, HARRIS E. DELOACH, JR., DANIEL R. DIMICCO, JOHN H. FORSGREN, JAMES H. HANCE, JR., JOHN T. HERRON, JAMES B. HYLER, JR., WILLIAM E. KENNARD, E. MARIE MCKEE, E. JAMES REINSCH, JAMES T. RHODES, CARLOS A. SALADRIGAS, B. KEITH TRENT, LLOYD M. YATES, JAMES E. ROGERS, WILLIAM BARNET III, PHILIP R. SHARP, | § § § § § § § § § § § § § § § § § § § § | |
| Individual Defendants-Below, Appellees, | § § § | |
| and | § § | |
| DUKE ENERGY CORPORATION, | § § | |
| Nominal Defendant-Below, Appellee. | § § § | |

Submitted: September 27, 2017
Decided: December 15, 2017

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, **SEITZ**, and **TRAYNOR**, Justices.

Upon Appeal from the Court of Chancery: **AFFIRMED**.

Martin S. Lessner, Esquire, Kathaleen St. J. McCormick, Esquire, Nicholas J. Rohrer, Esquire, and Meryem Y. Dede, Esquire, Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware; Robert A. Hoffman, Esquire, Jeffrey W. Golan, Esquire *(Argued)*, and Julie B. Palley, Esquire, Barrack, Rodos & Bacine, Philadelphia, Pennsylvania; Felipe J. Arroyo, Esquire, Shane P. Sanders, Esquire, and Gina Stassi, Esquire, Robbins Arroyo LLP, San Diego, California; Judith S. Scolnick, Esquire, Donald A. Broggi, Esquire, and Thomas L. Laughlin, Esquire, Scott+Scott, Attorneys at Law, LLP, New York, New York, for Plaintiffs-Below, Appellants City of Birmingham Retirement and Relief System, Robert L. Reese, Police Retirement System of St. Louis, Edward Tansey, and Estate of Leatrice Seinfeld.

Peter B. Andrews, Esquire and Craig J. Springer, Esquire, Andrews & Springer LLC, Wilmington, Delaware, for Individual Plaintiffs-Below, Appellants Robert L. Reese and City of Birmingham Retirement and Relief System.

Alfred G. Yates, Jr., Esquire, Law Offices of Alfred G. Yates, Jr., P.C., Pittsburgh, Pennsylvania, for Individual Plaintiff-Below, Appellant Robert L. Reese.

Kenneth J. Nachbar, Esquire *(Argued)*, Susan W. Waesco, Esquire, and Alexandra M. Cumings, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Jack B. Jacobs, Esquire, Sidley Austin LLP, Wilmington, Delaware; Steven M. Bierman, Esquire, Andrew W. Stern, Esquire, and Elizabeth A. Espinosa, Esquire, Sidley Austin LLP, New York, New York, for Defendants-Below, Appellees Lynn J. Good, Ann M. Gray, G. Alex Bernhardt, Sr., Michael G. Browning, Harris E. DeLoach, Jr., Daniel R. DiMicco, John H. Forsgren, James H. Hance Jr., John T. Herron, James B. Hyler, Jr., William E. Kennard, E. Marie McKee, E. James Reinsch, James T. Rhodes, Carlos A. Saladrigas, B. Keith Trent, Lloyd M. Yates, James E. Rogers, William Barnet III, and Philip R. Sharp.

**SEITZ**, Justice, for the Majority:

A stormwater pipe ruptured beneath a coal ash pond at Duke Energy Corporation's Dan River Steam Station in North Carolina. The spill sent a slurry of coal ash and wastewater—containing lead, mercury, and arsenic—into the Dan River, fouling the river for many miles downstream. In May 2015, Duke Energy pled guilty to nine misdemeanor criminal violations of the Federal Clean Water Act and paid a fine exceeding $100 million. The plaintiffs, stockholders of Duke Energy, filed a derivative suit in the Court of Chancery against certain of Duke Energy's directors and officers.[1] On behalf of the Company, they sought to hold the directors—a majority of whom were outside directors and were not named in the criminal proceedings—personally liable for the damages the Company suffered from the spill.

The directors moved to dismiss the derivative complaint, claiming the plaintiffs were required under Court of Chancery Rule 23.1 to make a demand on

---

[1] The director and officer defendants are Lynn J. Good, President, CEO, director, and chairwoman; Lloyd M. Yates, Executive Vice President; B. Keith Trent, Executive Vice President; Ann M. Gray, director and former chairwoman; G. Alex Bernhardt, Sr., director; Michael G. Browning, director; Harris E. DeLoach, director; Daniel R. DiMicco, director; John H. Forsgren, director; James H. Hance, Jr., director; John T. Herron, director; James B. Hyler, director; William E. Kennard, director; E. Marie McKee, director; E. James Reinsch, director; James T. Rhodes, director; Carlos A. Saladrigas, director; James E. Rogers, President and CEO from 2006 to 2013, director and chairman until 2013; William Barnet, III, director until 2014; and Philip R. Sharp, director until 2014. The plaintiffs do not dispute that at the time the complaints were filed, outside directors composed a majority of the board. For ease of reference, this opinion will refer to the defendant directors and officers simply as the directors.

the board of directors before instituting litigation. The plaintiffs responded that demand was futile because the board's mismanagement of the Company's environmental concerns rose to the level of a *Caremark*[2] violation, which posed a substantial risk of the directors' personal liability for damages caused by the spill and enforcement action. The Court of Chancery disagreed and dismissed the derivative complaint. According to the court, to hold directors personally liable for a *Caremark* violation, the plaintiffs must allege that the directors intentionally disregarded their oversight responsibilities such that their dereliction of fiduciary duty rose to the level of bad faith. After giving the plaintiffs the benefit of all reasonable pleading inferences, the court held that the reports from management relied on by the board to address coal ash storage problems negated any reasonable pleading-stage inference of bad faith conduct by the board.

We agree with the Court of Chancery that the plaintiffs did not sufficiently allege that the directors faced a substantial likelihood of personal liability for a *Caremark* violation. Instead, the directors at most faced the risk of an exculpated breach of the duty of care. Thus, the stockholders were required to make a demand on the board to consider the claims before filing suit. We therefore affirm the Court of Chancery's judgment dismissing the complaint.

---

[2] *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).

4

## I.

According to the allegations of the complaint, Duke Energy, a Delaware Corporation based in Charlotte, North Carolina, is the largest provider of electricity in the United States.[3] Duke Energy's coal-fired power plants generate a byproduct known as coal ash, which contains toxic and carcinogenic substances.[4] The plants dispose of the coal ash through wastewater treatment centers composed of unlined ponds where contaminants sink to the bottom and less-contaminated water stays at the top, to be discharged into adjacent rivers.

Under the Federal Clean Water Act ("CWA"),[5] "the discharge of any pollutant by any person shall be unlawful,"[6] unless granted a permit by the United States Environmental Protection Agency ("EPA") or the applicable state regulatory

---

[3] This Court, like the Court of Chancery, may rely on the allegations of the complaint and documents referred to or incorporated by reference. *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996); *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016). The documents incorporated into the complaint are fulsome because the plaintiffs demanded books and records from Duke Energy before filing suit under 8 *Del. C.* § 220.

[4] The toxic substances include arsenic, cadmium, chromium, lead, mercury, and selenium, which federal regulations define as toxic pollutants. 40 C.F.R. § 401.15. In 2010, the EPA specifically clarified that coal ash was a pollutant, and thus its discharge required a National Pollutant Discharge Elimination System ("NPDES") permit. *See* Memorandum from James A. Hanlon, Dir., U.S. Envtl. Prot. Agency, Office of Wastewater Mgmt., NPDES Permitting of Wastewater Discharges from Flue Gas Desulfurization (FGD) and Coal Combustion Residuals (CCR) Impoundments at Steam Electric Power Plants, Attach. B: Water Quality-Based Effluent Limits Coal Combustion Waste Impoundments (June 7, 2010).

[5] 33 U.S.C. §§ 1251–1388.

[6] *Id.* § 1311(a).

5

body[7]—in this case, the North Carolina Department of Environmental and Natural Resources ("DENR").[8]  Primary enforcement authority lies with the regulatory body.[9]  If third parties wish to sue a company for violating the CWA, they must first file a notice of intent with the applicable regulatory bodies.[10]  If a notified regulator does not initiate enforcement within sixty days, the third party litigant may proceed with the suit.[11]  If, however, the state or federal regulatory party files suit within the sixty-day limit, the third parties lose standing to sue.[12]  Although the third parties lose standing, they can move to intervene in the litigation between the regulator and

---

[7] *Id.* § 1342(b) ("[T]he Governor of each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact.").

[8] *Id.* § 1342.  Federal permits are issued under the NPDES.  *Id.*

[9] *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 60 (1987) (explaining that Congress intended for citizen suits to "supplement rather than to supplant" the enforcement powers of governmental agencies).

[10] 33 U.S.C. § 1365(b)(1).

[11] *Id.*

[12] *Id.* §§ 1319, 1365(b)(1).

the defendant.[13]  Further, a third party can regain standing if the regulator fails to "diligently prosecute" the alleged violator once suit is filed.[14]

In 2013, several citizens' environmental groups filed a notice of intent to sue three of Duke Energy's subsidiaries under the CWA for coal ash seepages at ponds in North Carolina.[15]  In response, the North Carolina Department of Environmental Quality ("DEQ") filed an enforcement action, which preempted the suits.[16]  DEQ

---

[13]  *Id.* §§ 1365(b)(1), 1365(g) ("No action may be commenced . . . if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right."; "For purposes of this section 'citizen' means a person having an interest which is or may be adversely affected."); *see, e.g.*, App. to Opening Br. at 270 (Keith Trent, Environmental Review Presentation, August 27, 2013, at 8 [hereinafter ERP]) (stating that "Riverkeeper and Sierra Club [were] granted intervener status" in the Asheville and Riverbend enforcement actions"); *United States v. Hooker Chems. & Plastics Corp.*, 540 F. Supp. 1067, 1082–83 (W.D.N.Y. 1982), *aff'd*, 749 F.2d 968 (2d Cir. 1984) (granting intervention in EPA prosecution to people affected by environmental violations due to close proximity to contaminated water).

[14]  *Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*, 141 F. Supp. 3d 428, 440 (M.D.N.C. 2015) [hereinafter *Yadkin*].

[15]  Duke Energy Carolinas, Duke Energy Progress, and Duke Energy Business Services, LLC.  *See* App. to Opening Br. at 639 (Plea to Crim. Info. & Sent'g Hearing, *In re Duke Energy Corp. Coal Ash Derivative Litig.*, C.A. No. 9682-VCG (Del. Ch. Nov. 15, 2016) (TRANSCRIPT) [hereinafter *In re Duke Energy*]).

[16]  The plaintiffs allege that Duke Energy asked DEQ to bring the charges to preempt the citizen suits.  Opening Br. at 15.  However, the plaintiffs' only support for this allegation is a meeting between Duke Energy's lawyers and DEQ that took place after the citizen groups filed their notice of intent to sue Duke Energy for the CWA violations.  *See* App. to Opening Br. at 61 (Am. Compl. 97 ¶ 120); Michael Wines, *Emails Link Duke Energy and North Carolina*, N.Y. TIMES (Mar. 14, 2014), https://www.nytimes.com/2014/03/14/us/emails-link-duke-energy-and-state.html (stating that "emails show[] Duke officials contacted the State Department of Environment and Natural Resources, *apparently* seeking an agreement addressing the center's complaint") (emphasis added).  The plaintiffs did not include with their complaint the emails or any specific factual evidence that Duke Energy asked DEQ to bring the suits at this meeting.  Regardless, as explained below, even if Duke Energy had requested DEQ bring the suit, this reflects a reasonable business decision and is neither illegal nor improper.  App. to Opening Br. at 44 (Am. Compl. 8 ¶ 12); Answering Br. at 41–42.

and Duke Energy negotiated a consent decree that would require Duke Energy to pay a $99,000 fine and create a compliance schedule.[17] The consent decree also required Duke Energy to "identify[] and characteriz[e] seeps" and conduct "[g]roundwater studies."[18] The Company planned to use the decree as a "model for resolving litigation" at twelve other sites,[19] and estimated that enforcing the decree at all of its North Carolina locations would cost between $4 and $5 million.[20] The consent decree was subject to a public comment period and court approval.[21]

DEQ withdrew from the proposed consent order when on February 2, 2014, a stormwater pipe ruptured beneath a coal ash containment pond at Duke Energy's Dan River Steam Station in Eden, North Carolina, releasing twenty-seven million gallons of coal ash slurry and wastewater into the Dan River.[22] Duke Energy had never inspected the pipe, although a Duke Energy station manager recommended the company pay $20,000 for camera inspections in both 2011 and 2012.[23] Upon investigation, federal and state regulators found that had Duke Energy completed a

---

[17] App. to Opening Br. at 270 (ERP, Aug. 27, 2013, at 8); *see also* App. to Answering Br. at 24 (ERP Minutes, Aug. 27, 2013, at 3).
[18] App. to Opening Br. at 271 (ERP, at 9).
[19] *Id.* at 270 (ERP, at 8).
[20] *Id.* at 271 (ERP, at 9).
[21] App. to Opening Br. at 380, 418 (Oral Arg. on Def.'s Mot. to Dismiss, *In re Duke Energy*, No. 9682-VCG, at 38, 76 (Nov. 16, 2016) (TRANSCRIPT)).
[22] *Id.* at 40 (Am. Compl. 4 ¶ 6).
[23] *Id.* at 172–74 (Joint Factual Statement, *United States v. Duke Energy Bus. Servs. et al.*, No. 5:15-CR-62-H, at 24–26 ¶¶ 69–76 (Del. Ch. Feb. 20, 2015)).

camera inspection, it likely would have discovered the corroded pipe.[24] The three subsidiaries pled guilty to nine misdemeanor violations[25] of the CWA, paid $102 million in fines, and agreed to restitution, community service, and mitigation.[26] All counts were negligence-based, and none of the defendants in this appeal were alleged to have any knowledge of the violations in the criminal proceedings.[27]

Duke Energy spent roughly $24 million to clean up the spill and acknowledged responsibility for future costs, including regulatory directives, damage to natural resources, and any additional litigation.[28] It paid a $2.5 million fine to Virginia for damages to the downriver City of Danville and a $6.8 million fine to DEQ,[29] and incurred additional costs to comply with environmental regulations newly enacted by North Carolina and the EPA[30]—regulations that could result in the closure of coal ash ponds for an estimated cost of $4.5 billion.[31]

---

[24] *Id.* at 174 (Joint Factual Statement 26 ¶ 79).

[25] Five counts of negligent discharge of pollutants from a point source into waters of the United States; three counts of failure to maintain treatment systems and equipment and related appurtenances; and one count of negligently violating a condition of a NDPES permit. *See* App. to Opening Br. at 668–76 (Plea to Crim. Info. & Sent'g Hearing 30:22–38:08).

[26] *Id.* at 49 (Am. Compl. 112 ¶ 146).

[27] *Id.* at 639 (Plea to Crim. Info. & Sent'g Hearing).

[28] *Id.* at 46 (Am. Compl. 10 ¶ 14).

[29] *Id.* at 46–47 (Am. Compl. 10–11 ¶ 14).

[30] *Id.* at 48 (Am. Compl. 12 ¶ 17).

[31] *Id.*

On April 22, 2016, the plaintiffs filed derivative suits in the Court of Chancery,[32] alleging that the directors breached their fiduciary duties because they knew of and disregarded Duke Energy's CWA violations and allowed Duke Energy to collude with DEQ to evade compliance with environmental regulations.[33] The plaintiffs sought damages on behalf of the Company of (1) $102 million for the fine resulting from the guilty pleas, (2) $24 million for repairs and remediation of the Dan River spill, (3) $12 million for the fines to North Carolina and Virginia, (4) $7 million for the fine to DEQ, and (5) additional costs associated with environmental litigation filed as a result of the spill.[34]

The directors moved to dismiss the complaint for failure to plead demand futility, claiming that the plaintiffs did not allege the particularized facts required by Court of Chancery Rule 23.1 to show that the directors faced a substantial likelihood of personal liability. The Court of Chancery agreed and found the facts alleged in the complaint did not lead to the reasonable inference that the directors consciously disregarded environmental problems at the site or improperly colluded with

---

[32] Originally, there were four suits filed in the Court of Chancery against the Duke Energy directors alleging breaches of fiduciary duty. They were consolidated into this case. *See* Order for Consolidation of the Related Actions, *In re Duke Energy*, C.A. No. 9682-VCN (Oct. 31, 2014).

[33] *Id.* at 38 (Am. Compl. 2 ¶ 1); App. to Opening Br. at 41 (Am. Compl. 5 ¶ 7) (asserting the Dan River spill "was the foreseeable and inevitable result of a pattern of willful violations of the [CWA] and the North Carolina state law").

[34] *Id.* at 139–40 (Am. Compl. 103–04).

regulators to avoid remediating environmental problems.[35] The court dismissed the complaint under Court of Chancery Rule 23.1 for failure to make a demand on the board. This appeal followed. We review the Court of Chancery's dismissal of a stockholder derivative complaint *de novo*.[36]

## II.

The board of directors, exercising its statutory authority to manage the business and affairs of the corporation, ordinarily decides whether to initiate a lawsuit on behalf of the corporation.[37] Stockholders cannot shortcut the board's control over the corporation's litigation decisions without first complying with Court of Chancery Rule 23.1. Before stockholders can assert a claim belonging to the corporation, they must first demand that the directors pursue the claim and, if the directors decline, attempt to demonstrate that the directors wrongfully refused the demand. Alternatively, stockholders can allege with sufficient particularity that

---

[35] Opening Br. at Ex. B (Telephonic Rulings, *In re Duke Energy.*, C.A. No. 9682-VCG, at 16 (Del. Ch. Dec. 8, 2016) (TRANSCRIPT)).

[36] *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008).

[37] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)); *see also Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 366 (Del. 2006) ("It is a fundamental principle of Delaware General Corporation Law that '[t]he business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors.'") (quoting 8 *Del. C.* § 141(a)); *Zapata Corp. v. Maldonado*, 420 A.2d 779, 782 (Del. 1981) (explaining the directors' "managerial decision making power . . . encompasses decisions whether to initiate, or refrain from entering, litigation").

11

demand is futile and should be excused due to a disabling conflict by a majority of the directors to consider the demand.[38]

For alleged violations of the board's oversight duties under *Caremark*, the test articulated in *Rales v. Blasband* applies to assess demand futility.[39]  Under *Rales*, the plaintiffs must plead particularized facts raising "reasonable doubt of the board's independence and disinterestedness when the demand would reveal board inaction of a nature that would expose the board to 'a substantial likelihood' of personal liability."[40]

When, like here, the directors are protected from liability for due care violations under § 102(b)(7) of the Delaware General Corporation Law, the plaintiff must allege with particularity that the directors acted with scienter, meaning "they had 'actual or constructive knowledge' that their conduct was legally improper."[41] In other words, the stockholders must allege "that a director acted inconsistent with his fiduciary duties and, most importantly, that the director *knew* he was so acting."[42]

---

[38] *Aronson*, 473 A.2d at 817; *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

[39] *Wood*, 953 A.2d at 140.

[40] *Horman v. Abney*, 2017 WL 242571, at *6 (Del. Ch. Jan. 19, 2017) (quoting *Rales*, 634 A.2d at 936); *see also In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009) (explaining demand is futile "in the rare case when a plaintiff is able to show director conduct that is so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists").

[41] *Wood*, 953 A.2d at 141 (citing *Guttman v. Huang*, 823 A.2d 492, 498 (Del. Ch. 2003)).

[42] *In re Massey Energy Co.*, 2011 WL 2176479, at *22 (Del. Ch. May 31, 2011) (emphasis in original); *see also Melbourne Mun. Firefighters' Pension Tr. Fund on Behalf of Qualcomm, Inc. v. Jacobs*, 2016 WL 4076369, at *8 (Del. Ch. Aug. 1, 2016), *aff'd*, 158 A.3d 449 (Del. 2017) (explaining plaintiffs must show "(1) that the directors knew or should have known that the

This is because a *Caremark* claim "is rooted in concepts of bad faith; indeed, a showing of bad faith is a *necessary condition* to director oversight liability."[43] A specific example of bad faith is when the director engages in an "intentional dereliction of duty" or "conscious disregard for one's responsibilities,"[44] or acted "with the intent to violate applicable positive law."[45] Because of the difficulties in proving bad faith director action, a *Caremark* claim is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[46]

At the pleading stage, the court must accept particularized allegations of fact as true, and all reasonable inferences must be drawn in the plaintiffs' favor.[47] But, under Rule 23.1, the plaintiffs have "a heightened burden to plead particularized facts establishing a "reasonable doubt that . . . the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[48] "[I]nferences that are not objectively reasonable cannot be drawn in the plaintiff's favor."[49]

---

corporation was violating the law, (2) that the directors acted in bad faith by failing to prevent or remedy those violations, and (3) that such failure resulted in damage to the corporation").
[43] *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d at 123 (emphasis in original).
[44] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 66 (Del. 2006).
[45] *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d at 125 (emphasis in original).
[46] *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d at 967; *see also Stone*, 911 A.2d at 372.
[47] *White*, 783 A.2d at 549.
[48] *Rales*, 634 A.2d at 934; *see also Del. Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1020 (Del. 2015); *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000).
[49] *Wood*, 953 A.2d at 140.

On appeal, the plaintiffs argue the court erred in finding the complaint lacked sufficient facts to establish a substantial likelihood that the individual directors would be personally liable for allowing Duke Energy to violate environmental laws, thus excusing demand. The plaintiffs focus their claims of error on two central points: first, the court improperly discredited the plaintiffs' interpretation of board presentations and minutes, which, according to the plaintiffs, showed Duke Energy was violating environmental laws and avoiding remediation; and second, when considering the plaintiffs' allegation that Duke Energy was exploiting its relationship with a "captive" regulator, the Court of Chancery failed to draw the proper inferences from evidence of what the plaintiffs characterize as collusion between Duke Energy and its regulator.[50] We address each of these arguments in turn.

A.

*The Board Presentations*

The Court of Chancery reviewed the board presentations addressing the ash ponds at Duke Energy's power generation sites, and concluded that the board was both "aware of environmental problems [and] what the company was doing to attempt to address those situations."[51] According to the court, the directors did not

---

[50] Opening Br. at 24–25.
[51] *Id.* at Ex. B (Telephonic Rulings, at 16).

14

consciously disregard the environmental problems. Rather, the presentations informed the board that Duke Energy was working with DEQ "to achieve regulatory compliance in a cost-effective way with limited liability."[52] The court found the board presentations an insufficient basis to raise a reasonable inference of bad faith by the board.

On appeal, the plaintiffs challenge the Court of Chancery's conclusion, pointing to specific information in the board presentations and minutes that they argue suggested longstanding knowledge and disregard of environmental violations.[53] The plaintiffs first highlight the December 12, 2012 Coal Combustion Residuals presentation, which stated that "[s]ome metals have leached to groundwater from unlined landfills and surface impoundments."[54] Thus, the plaintiffs argue, the board knew Duke Energy was violating the law but did nothing to remedy it.

The plaintiffs unfairly describe the overall presentation, which we are not required to accept on a motion to dismiss. Jeff Lyash, Executive Vice President of Energy Supply, presented to the board's Regulatory Policy and Operations Committee on the Company's exposure (liability) from coal combustion residuals

---

[52] *Id.* (Telephonic Rulings, at 11).

[53] *Id.* at 24.

[54] *Id.* at 13; App. to Opening Br. at 214 (Jeff Lyash, Coal Combustion Residuals Presentation, Dec. 12, 2012, at 3 [hereinafter CCRP]); *see also* App. to Answering Br. at 6–11 (Mitch Griggs, Environmental Compliance Assurance Presentation, Oct. 29, 2012, 1–6).

("CCR's"), which are different kinds of coal ash. Lyash informed the committee that CCR's were "classified currently as non-hazardous" but the regulatory environment was changing.[55] Although informed that metals had leached into groundwater, the board committee was also informed there was "no indication that drinking water is being impacted."[56] Further, the purpose of the presentation was to chart a future course for addressing proposed EPA regulations governing CCR pollution. The board committee was informed that the EPA had proposed eliminating "wet ash management and un-lined CCR storage."[57] After inventorying Duke Energy's CCR storage sites, and estimating the financial impact of the proposed regulations, Lyash informed the board committee of Duke Energy's work underway to mitigate risks:

- Dry Ash Handling—Converted to dry fly ash handling at most large base load coal units that will operate past 2015. Projects budgeted over next few years to convert bottom ash transport to dry systems.
- Groundwater Monitoring—Voluntarily groundwater monitoring of NC ash basins for several years, providing data to the state. Now a requirement of NC wastewater permits in 2011. No indication that drinking water is being impacted.
- Closure Design—Currently utilizing anticipated closure design that incorporates synthetic/plastic membrane cap and drainage layers. Geo-membrane cap design minimizes rain and surface water in-leakage and resultant leaching.
- Regulatory Engagement—Continuing to advocate efforts to shape the final regulation. Currently closing some basins at Gibson under

---

[55] *Id.* at 214 (CCRP, at 3).
[56] *Id.* at 221 (CCRP, at 10).
[57] *Id*. at 216 (CCRP, at 5).

agreement with [the Indiana Department of Environmental Management]. Evaluating closures at small retired or retiring sites as a part of decommissioning work.[58]

The presentation is fairly described as a status update to the board committee of the proposed EPA regulations' impact on Duke Energy's ash disposal practices, and its "work underway" for "risk mitigation."[59] As the Court of Chancery found, the board was not only informed of environmental problems, but also the steps being taken to address them. It does not support plaintiffs' central theory that a majority of the board consciously ignored or intentionally violated positive law.

The plaintiffs next point to the August 27, 2013 Environmental Review Presentation to the board of directors. In the twenty-two pages of slides, Keith Trent, Executive Vice President and Chief Operating Officer of Regulated Utilities, presented a comprehensive review of the history of coal ash ponds and environmental regulation, on-going litigation, and steps Duke Energy was taking to mitigate the financial and environmental risks posed by ash ponds at various Duke Energy sites.[60]

The plaintiffs focus on one line in a slide stating "[s]eeps are unpermitted discharges; [groundwater] violations."[61] The statement they refer to, however, was

---

[58] *Id.* at 221 (CCRP, at 10).
[59] *Id.*
[60] App. to Opening Br. at 263–84, (ERP, at 1–22).
[61] *Id.* at 267 (ERP, at 5).

reporting allegations against Duke Energy in pending lawsuits.[62]  But more to the

point, the board was informed that Duke Energy:

- "Routinely inspect[ed and] repair[ed]" ash dike stability;
- "[A]cted on all EPA [and] State inspection and recommendations";
- Conducted "[g]uide monitoring," and "review[ed] results with state agency";
- Took action "especially where potential impacts exist with receptors";
- "Advocat[ed for] federal 'non-hazardous' legislation and regulations";
- "Perform[ed] site-specific studies'";
- Submitted "an ash basin closure plan" to state regulators to "review for approval";
- "Identified seeps to state" and found a "negligible impact to the overall surface water quality"; and
- "Based on routine assessments," took "proactive actions . . . to mitigate risks and potential impacts."[63]

As to "Seepage," the presentation informed the board that Duke Energy:

- Found that the "[v]olume of ash basin seepage . . . is extremely small and has negligible impact to overall surface water quality";
- "Routinely informed the state of seeps"; and
- Identified the seeps "in detail to state agencies during recent water permit renewals."[64]

As to "Exceedances of groundwater standards," the presentation informed the board

that Duke Energy:

- Conducted groundwater monitoring "since 2007 or before with results submitted to state agencies";

---

[62] *Id.* ("Highlighted Issues—Recent Allegations: Seeps are unpermitted discharges; [groundwater] violations."). As of the date of the presentation it was not altogether clear that "seeps" were in fact unpermitted discharges under Duke Energy's permits. *Id.* at 325, 327–28 (Def.'s Reply Br. on Mot. to Dismiss, *In re Duke Energy*, No. 9682-VCG, at 11, 13–14 (Aug. 31, 2016)).

[63] *Id.* at 265–66 (ERP, at 3–4).

[64] *Id.* at 268 (ERP, at 6).

18

- Took "corrective action at three sites with receptors where there was a potential impact to neighbors";
- Found "no indication of impacts at other receptor sites";
- "Develop[ed] and implement[ed] measures ([at] operating and retired sites) to address [groundwater] exceedances, seeps and long-term water quality protection"; and
- Submitted groundwater assessment reports at North Carolina's request.[65]

The August 27, 2013 Environmental Review Presentation is fairly characterized as another update on environmental problems associated with coal ash disposal sites, and steps Duke Energy was taking to address the environmental concerns. It does not lead to a reasonable inference of the board's bad faith conduct by consciously ignoring environmental problems.

The plaintiffs' allegations here are like those in *Stone v. Ritter*.[66] In *Stone*, this Court considered whether a board of directors failed to discharge its oversight duties regarding compliance with the Federal Bank Secrecy Act.[67] Although "[n]either party dispute[d] that the lack of internal controls resulted in a huge fine," the reports to the board showed that the board "exercised oversight by relying on

---

[65] *Id.* at 269 (ERP, at 7). Plaintiffs emphasize that, according to the joint factual statement, Duke Energy did not provide "detailed, specific, and comprehensive data concerning seeps" until after the Dan River spill. *Id.* at 192 (Joint Factual Statement 44 ¶ 138). However, the plaintiffs omit the preceding sentence, which stated that between 2010 and 2014, Duke Energy provided "detailed information concerning seeps, including engineered seeps." *Id.* The fact the reports became more "specific" or "comprehensive" after the spill does not mean that the seeps were disregarded in bad faith before the spill.

[66] 911 A.2d 362.

[67] *Id.*

periodic reports" from the officers.[68]  Thus, the court found plaintiffs' complaint unsuccessfully attempted "to equate a bad outcome with bad faith."[69]  Similarly, the plaintiffs here conflate the bad outcome of the criminal proceedings with the actions of the board.  As in *Stone*, the board "exercised oversight" by receiving management presentations on the status of environmental problems.  The presentations identified issues with the coal ash disposal ponds, but also informed the board of the actions taken to address the regulatory concerns.  Thus, we agree with the Vice Chancellor that the board presentations do not lead to the inference that the board consciously disregarded its oversight responsibility by ignoring environmental concerns.[70]

---

[68] *Id.* at 372–73.

[69] *Id.* at 373; *see also In re Gen. Motors Co. Derivative Litig.*, 2015 WL 3958724, at *11 (De. Ch. June 26, 2015).

[70] The plaintiffs also argue Duke Energy's guilty pleas from the Dan River spill provide evidence that the board consciously disregarded environmental violations.  Opening Br. at 24–25, 32, 37–38; Reply Br. at 11.  The plaintiffs argue "there is reason to believe that the failure to properly inspect the stormwater pipes was the product of a high-level decision within the company." *Id.* at 22.  But this speculative assertion is unsupported by particularized facts connecting the board to the negligence-based guilty pleas, and "[w]ithout a connection to the board, a corporate calamity will not lead to director liability." *La. Mun. Police Emps.' Ret. Sys. v. Pyott*, 46 A.3d 313, 340 (Del. Ch. 2012), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013).  The plaintiffs also argue that the board had long-standing knowledge of the criminal violations due to a letter from DEQ to EPA, which stated that seeps "have been well known and well documented for decades, yet virtually no initiative was undertaken by any governmental organization or governmental agency to address these problems until quite recently."  App. to Opening Br. at 286 (Letter from Dan R. van der Vaart, Deputy Sec'y & Energy Policy Advisor, DENR, to Hon. Regina McCarthy, Adm'r EPA, and Lynn J. Good, President & CEO, Duke Energy Progress, Inc. and Duke Energy Carolinas, Aug. 28, 2014, at 1, 11).  However, the fact the board was aware of the seeps does not mean they consciously disregarded them—the presentations show that the board was regularly informed of Duke Energy's remedial actions—and the letters state that no *governmental* organization or agency addressed the issues, which does not show the *board* disregarded them.  *See Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007) ("Delaware courts routinely reject the conclusory allegation

## B.

### *Collusion with Regulators*

To overcome the motion to dismiss, plaintiffs concede that they must plead sufficient facts showing that the board knew DEQ was a "captive regulator" with whom Duke Energy was "colluding."[71]  The Court of Chancery rejected this argument, finding it "a theory at once creative and unsustainable on the facts plead."[72]  According to the court, even if DEQ's prosecution of environmental violations was "insufficiently rigorous, or even wholly inadequate," it fell short of leading to a reasonable inference that Duke Energy illegally colluded with regulators.[73]

On appeal, the plaintiffs claim the Court of Chancery made several errors in reaching this conclusion.  Before addressing the details of these arguments, however, it is important to keep in mind the target the plaintiffs must hit to defeat the motion to dismiss.  As the Court of Chancery found, it is not enough to allege cooperation

---

that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so.").

[71] App. to Opening Br. at 451 (Oral Arg. on Def.'s Mot. to Dismiss 109:8–14) ("[T]he captive and corrupt and nonenforcing agency is a linchpin of our argument"; "the whole thing depends on the board being aware that it has got this lapdog regulator that won't enforce the law.").

[72] Opening Br. Ex. B. (Telephonic Rulings, at 12).

[73] *Id.* (Telephonic Rulings, at 16–17); *see Yadkin Riverkeeper*, 141 F. Supp. 3d at 441 (explaining that to overcome a presumption of diligent prosecution, the plaintiff must show conduct that is "dilatory, collusive or otherwise in bad faith"—"[i]t is insufficient to merely show 'that the agency's prosecution strategy is less aggressive than [the plaintiff] would like'") (citations omitted).

with what plaintiffs describe as a too-friendly regulator. Instead, the plaintiffs must allege in sufficient detail that Duke Energy illegally colluded with a corrupt regulator.[74] And then, plaintiffs must tie the improper conduct to an intentional oversight failure by the board.[75] The complaint falls short of these pleading requirements.

1.

<em>The Consent Decree</em>

The plaintiffs first argue the consent decree negotiated with DEQ was a fig leaf because it only imposed a $99,000 fine and did not require remediation.[76] They allege that the fine was a "meaningless amount" in light of Duke Energy's $2.5

---

[74] *In re Toys "R" Us, Inc. S'holder Litig.*, 2005 WL 5756357, at *31 n.50 (Del. Ch. June 24, 2005) (quoting Merriam-Webster's Online Dictionary (10th ed. 1993)) (defining collusion as "a secret agreement or cooperation, especially for an illegal or deceitful purpose"); *see also Dickerman v. N. Tr. Co.*, 176 U.S. 181, 190 (1900) ("Collusion is defined by Bouvier as 'an agreement between two or more persons to defraud a person of his rights by the forms of law, or to obtain an object forbidden by law,' and in similar terms by other legal dictionarians."); *Sidman v. Travelers Cas. & Sur.*, 841 F.3d 1197, 1206 (11th Cir. 2016) (quoting *Collusion*, WEBSTER'S 3D NEW INT'L DICTIONARY 446 (2002)) ("Dictionary definitions of collusion include a 'secret agreement,' 'secret cooperation for a fraudulent or deceitful purpose,' 'a secret agreement between two or more persons to defraud a person of his rights often by the forms of law,' an 'agreement between parties considered adversaries at the law,' and 'a secret agreement considered illegal for any reason.'").

[75] Here is where our dissenting colleague misses the mark. The dissent recites Duke Energy's troublesome record of environmental violations. Fair point. But, the question on appeal is not whether Duke Energy violated environmental laws. It did. Rather, the question is what the directors—a majority of whom were independent—knew about the violations and whether they ignored them. As we have shown, based on the specific arguments raised on appeal, the plaintiffs have not demonstrated a pleading stage reasonable inference that those directors knew Duke Energy was violating the law *and* knew from the information presented to the board that the Company ignored the violations.

[76] Opening Br. at 17.

22

billion yearly earnings [77] and that remediation would not occur because the compliance schedule was not yet established, but was to be "further delineat[ed]."[78]

Like their characterization of the board presentations, the plaintiffs isolate one part of a much bigger picture. In addition to the fine, Duke Energy estimated spending $4 to $5 million to enforce the consent decree at all its North Carolina sites,[79] $100,000 to identify and characterize seeps, and $300,000 to $500,000 to conduct groundwater studies and reroute flows or treatment.[80] Duke Energy also expected to negotiate a compliance schedule with regulators. Further, the presentations show the EPA had still not finalized rules regulating CCR, and there were "[i]ndications that final rule may be non-hazardous,"[81] which would impact remediation costs. Regardless, even though DEQ imposed a relatively small fine and gave Duke Energy time to establish a compliance schedule, which was not as aggressive as the plaintiffs would have preferred, those facts do not lead to an inference that the board should have been alerted to corrupt activities between Duke Energy and its regulator. Nor does it lead to a reasonable inference that the board ignored evidence of alleged misconduct with a state regulator.[82]

---

[77] *Id.*

[78] *Id.* at 37; App. to Opening Br. at 270–71 (ERP, at 8–9).

[79] App. to Opening Br. 271 (ERP, at 9).

[80] *Id.*

[81] *Id.* at 273 (ERP, at 11).

[82] The plaintiffs' criticisms of the consent decree are like those raised in *Tennessee Clean Water Network v. Tennessee Valley Authority*, 206 F. Supp. 3d 1280 (M.D. Tenn. 2016), *reconsideration*

23

Finally, the collusion argument loses its force when another undisputed fact is considered—the consent decree was subject to approval by the North Carolina court.[83] The public and environmental groups who intervened in the enforcement action had the opportunity to comment on and object to the consent decree before a court gave it the force of law. Thus, if the consent decree was as deficient as the plaintiffs claim and resulted from improper collusion with regulatory authorities, the court was in a position to make that judgment, and refuse to approve it.

---

*denied,* 2016 WL 7491625 (Dec. 30, 2016). Conservation organizations sued the Tennessee Valley Authority ("TVA"), arguing the State of Tennessee was not diligently prosecuting TVA for CWA violations at a coal-fired power plant. The plaintiffs challenged the "pace and aggressiveness" of the prosecution, TVA's preference to work with the state agencies instead of facing litigation, and the fact the agreed injunctive order did not itself mandate compliance. *Id.* at 1239. The court rejected these arguments, holding that "comparable delays are not so unusual to give rise to an inference of a lack of diligence," and TVA's preference to work with the state did "not amount to a showing of bad faith." *Id.* at 1294. It also dismissed the claim challenging the effectiveness of the injunction regarding compliance, because the injunction was not a final order, but was subject to further changes. Similarly, as explained above, the plaintiffs' dissatisfaction with the timing and effectiveness of the consent decree or its preference to work with DEQ does not lead to a reasonable inference of bad faith. *Id.* (quoting *Karr v. Hefner*, 475 F.3d 1192, 1197 (10th Cir. 2007)) ("Section 1365(b)(1)(B) does not require government prosecution to be far-reaching or zealous. It requires only diligence. Nor must an agency's prosecutorial strategy coincide with that of the citizen–plaintiff."); *see also Williams Pipe Line Co. v. Bayer Corp.*, 964 F. Supp. 1300, 1324 (S.D. Iowa 1997) ("The government agency is not required to succeed by the private party's definition of success.").

[83] App. to Opening Br. at 380, 418 (Oral Arg. on Def.'s Mot. to Dismiss, at 38, 76 ("[Y]ou do need a court to approve it, and no court ever approved it."); *id.* at 799 (Def.'s Opening Br. on Mot. to Dismiss, at 26).

2.

*Lax Environmental Law Enforcement*

Next, plaintiffs argue that the board should have known DEQ was a captive regulator because DEQ was not a "particularly vigorous enforcer of environmental laws," and became "particularly friendly" when Patrick McCrory was elected governor.[84]  The Court of Chancery labelled this conclusion a *non sequitur*, finding it was "belied by the fact that part of the actions and interactions with DEQ . . . predate the McCrory administration."[85]  On appeal, plaintiffs argue that the Court of Chancery gave insufficient weight to their allegations that DEQ "effectively abandoned its role of pursuing enforcement against polluters,"[86] as evidenced by agency employees threatened with job loss if they enforced regulations.[87]

Although the plaintiffs have alleged that DEQ in general did not aggressively enforce environmental laws, DEQ's lack of aggressiveness does not lead to an inference in this case that Duke Energy illegally colluded with DEQ, and that the board was complicit in such illegal activities.  We agree with the Court of Chancery

---

[84] Opening Br. at 14–15.  McCrory was a Duke Energy employee for twenty-eight years.  The plaintiffs allege Duke Energy contributed $1.1 million to his campaign for governor.  *Id.* at 15.

[85] *Id.* at Ex. B. (Telephonic Rulings, at 13).

[86] *Id.* at 15.

[87] *Id.*  To support this contention, the plaintiffs rely on a New York Times article in which a supervisor stated that "[t]hey want a hammer to come down on anybody who hinders developers by enforcing regulations."  App. to Opening Br. at 306 (Trip Gabriel, *Ash Spill Shows How Watchdog Was Defanged*, N.Y. Times (Feb. 28, 2014), https://www.nytimes.com/2014/03/01/us/coal-ash-spill-reveals-transformation-of-north-carolina-agency.html).

that general allegations regarding a regulator's business-friendly policies are insufficient to lead to an inference that the board knew Duke Energy was colluding with a corrupt regulator.

In the Court of Chancery, the plaintiffs also pointed to Duke Energy's goal to preempt the citizens' suits, which allegedly leads to the conclusion that the board should have known Duke Energy would collude with DEQ in bad faith.[88] The court found this conclusion unsustainable, explaining that the facts showed that Duke Energy was working with DEQ "to minimize its liability and maximize the time it had to bring its facilities in[to] compliance with environmental regulations,"[89] which was a reasonable business decision devoid of bad faith.[90]

On appeal, plaintiffs challenge this conclusion, arguing that DEQ's prosecution "was not undertaken in good faith for the purpose of crafting a regulatory solution," but was rather undertaken to "avoid remediation."[91] To support this contention, Plaintiffs first point to a May 1, 2013 Regulated Utilities Update Presentation, which states:

> [North Carolina] has initiated enforcement action against Asheville, which ordinarily deprives environmental groups of right to sue: We will be working with NC to resolve Asheville and hopefully address other plants at the same time. We do expect a civil penalty and compliance

---

[88] Opening Br. at 34–41.
[89] *Id.* at Ex. B. (Telephonic Rulings, at 16).
[90] *Id.*
[91] *Id.* at 14. The plaintiffs allege the board "was fully apprised of and endorsed" of this strategy to "evade compliance with positive law." *Id.* at 2.

26

schedule of tasks, all of which constitute "diligent prosecution" and bar the environmental groups' citizen suit.[92]

The plaintiffs argue that because Duke Energy wanted to "hopefully address other plants at the same time," it was attempting to establish "a veneer of 'diligent prosecution.'"[93] But, as the Court of Chancery found, the reasonable interpretation of this statement was innocuous—Duke Energy chose to work with DEQ to address all of its facilities at the same time to minimize costs and avoid repeated prosecution.[94] As noted before, the lead regulator with enforcement authority is DEQ, not concerned citizens. Further, the board was informed through presentations that Duke Energy expected "a civil penalty and compliance schedule of tasks," which meant Duke Energy anticipated actual remediation and was not just "facially appear[ing]" to be complying with the law.[95] When the board presentations are fairly considered, none of the facts relied on by the plaintiffs lead to a reasonable inference of bad faith conduct by the board.

---

[92] App. to Opening Br. at 244 (Lloyd Yates, Keith Trent, and Dhiaa Jamil, Regulated Utilities Update Presentation, May 1, 2013, at 13).

[93] Opening Br. at 17.

[94] The plaintiffs argue the use of quotations marks around the term "diligent prosecution" was "a wink and a nod to directors that DEQ just has to facially appear to be enforcing the law." *Id.* at 38. However, "diligent prosecution" is a term of art, and putting the two words in quotation marks is thus unremarkable.

[95] *Id.*

The plaintiffs also rely on board minutes stating that Duke Energy wanted to "maintain control over its coal ash ponds,"[96] leading to the inference that Duke Energy did not want to "expend funds to comply with the law."[97]  That inference, however, is not one reasonably drawn from the minutes.  A company's desire to maintain control of its operations, without more, does not lead to a conclusion the company would violate the law to do so.

Finally, the plaintiffs rely on a federal decision that held DEQ was not diligently prosecuting a case against Duke Energy.  In *Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*,[98] the plaintiffs brought suit against Duke Energy for CWA violations at Duke Energy's Buck Steam Station coal-burning power plant.[99]  Because DEQ was already prosecuting Duke Energy for the violations, the plaintiffs could only proceed with their suit if DEQ's prosecution was not "diligent."[100]  To establish a lack of diligence, the plaintiffs had to show "a pattern of conduct in [the state's] prosecution of the defendant that could be considered dilatory, collusive or

---

[96] App. to Opening Br. at 260–61 (Regulatory Police and Operations Committee Meeting Minutes, May 1, 2013, at 3–4).

[97] Opening Br. at 38.

[98] 141 F. Supp. 3d 428.

[99] *Id.* at 442–43.

[100] 33 U.S.C. § 1365(b)(1).  To determine whether prosecution is diligent, the court must first ask "whether, at the time the citizen suit was filed, the EPA or state had commenced a judicial action to enforce the same standard, limitation, or order as the citizen suit."  *Yadkin*, 141 F. Supp. 3d at 440.  Here, the parties do not contest that the citizens' groups and DEQ both filed actions for CWA violations at its North Carolina sites; thus, this requirement is met.  The court then evaluates "whether the EPA or state was 'diligently prosecuting' its enforcement action at the time the citizen suit was filed."  *Id.*

otherwise in bad faith."[101] The *Yadkin* court held that plaintiffs met their burden of proving dilatory prosecution, meaning DEQ "appear[ed] to have done little, if anything, to move the case forward. It had not taken depositions, it had not filed motions, and an initial case management order was not yet in place, one year into litigation."[102] Because the court believed there was "little likelihood that [DEQ's] action would proceed expeditiously to a final resolution," the court held the prosecution was not diligent and allowed the plaintiffs to proceed with their suit.[103]

The plaintiffs argue the *Yadkin* decision is "persuasive evidence that DEQ was a captive regulator" in the instant case.[104] But the Yadkin court found a lack of diligent prosecution—not bad faith by the Company or the board. Like plaintiffs' other arguments, the court's finding of a lack of diligence in pursuing litigation does not lead to a reasonable inference that DEQ was a corrupt regulator colluding with Duke Energy, and that the board knew about the corrupt activities and consciously ignored those facts.

## III.

Duke Energy was responsible for fouling the Dan River with a slurry of toxic coal ash, causing major environmental damage many miles downstream. The

---

[101] *Id.* at 441 (quoting *Conn. Fund for the Env't v. Contract Plating Co.*, 631 F. Supp. 1291, 1293 (D. Conn. 1986)).
[102] *Yadkin*, 141 F. Supp. 3d at 442.
[103] *Id.*
[104] Opening Br. at 36.

Company pled guilty to environmental crimes and faced stiff fines and costly remediation expenses. The backlash for its poor environmental stewardship was severe. The EPA and the State of North Carolina responded by enacting stricter laws and proposing rules governing coal ash pond maintenance and closure.[105]

None of this reflected well on Duke Energy. But, the question before us is not whether Duke Energy should be punished for its actions. That has already happened. What is before us is whether a majority of Duke Energy directors face a substantial likelihood that they will be found personally liable for intentionally causing Duke Energy to violate the law or consciously disregarding the law. We find, as the Court of Chancery did, that the plaintiffs failed to meet this pleading requirement.[106] Thus, the plaintiffs were required to first demand that the board of directors address the claims they wished to pursue on behalf of the Company.

---

[105] Coal Ash Management Act of 2014, N.C. Gen. Stat. §§ 130A-309.200–231 (2015) (requiring corrective action to restore groundwater quality, identify, and address unpermitted discharges at its lagoons, and close all lagoons by the year 2029); Disposal of Coal Combustion Residuals from Electric Utilities, Final rule, 80 Fed. Reg. 21,302 (Apr. 17, 2015) (to be codified at 40 C.F.R. pts. 257, 261) ("[E]stablishes nationally applicable minimum criteria for the safe disposal of coal combustion residuals in landfills and surface impoundments."); *id.* at 21,303 (stating minimum criteria for "location restrictions, liner design criteria, structural integrity requirements, operating criteria, groundwater monitoring and corrective action requirements, closure and post-closure care requirements, and recordkeeping, notification, and internet posting requirements").

[106] The dissent concludes that "the facts as pled support a fair inference that the board was all too aware that Duke's business strategy involving flouting important laws, while employing a strategy of political influence-seeking and cajolement to reduce the risk that the company would be called to fair account."[106] These conclusions, however, are not fairly connected to what was actually presented to the board, a majority of whom were independent directors. Instead, the presentations show the board was informed that Duke Energy was aware of environmental violations and had plans to address them, which contradicts the inference that the board knew Duke Energy was

We therefore affirm the Court of Chancery's December 14, 2016 judgment dismissing the plaintiffs' derivative complaint.

---

"flouting" the law. As explained before, it is not enough to allege that the Company violated environmental laws and had a cozy relationship with regulators. The plaintiffs must trace that conduct to the board to survive a dismissal motion, which they have not done here. See *Brehm*, 746 A.2d at 254 ("Rule 23.1 is not satisfied by conclusory statements . . . .").

**STRINE**, Chief Justice, dissenting:

With regret, I respectfully dissent from the well-stated decision of my colleagues, which affirms a thoughtful decision of the Court of Chancery. I do so because I find that the facts pled raise a pleading stage inference that it was the business strategy of Duke Energy, accepted and supported by its board of directors, to run the company in a manner that purposely skirted, and in many ways consciously violated, important environmental laws. Being skilled at running an energy company whose conduct presented environmental hazards, but whose operations provided an important source of employment, Duke's executives, advisors, and directors used all the tools in their large box to cause Duke to flout its environmental responsibilities, therefore reduce its costs of operations, and by that means, increase its profitability. This, fiduciaries of a Delaware corporation, may not do.[107]

---

[107] *See, e.g.*, *In re Massey Energy Co.*, C.A. No. 5430-VCS, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011) (gathering sources for the proposition that "Delaware law does not charter law breakers. Delaware law allows corporations to pursue diverse means to make a profit, subject to a critical statutory floor, which is the requirement that Delaware corporations only pursue 'lawful business' by 'lawful acts.' As a result, a fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law."); *see also* 8 *Del. C.* § 101(b) ("A corporation may be incorporated or organized under this chapter to conduct or promote any lawful business or purposes . . . ."); 8 *Del. C.* § 102(a)(3) ("It shall be sufficient to state . . . that the purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized . . . and by such statement all lawful acts and activities shall be within the purposes of the corporation . . . .")).

My primary disagreement with my friends in the majority and the Court of Chancery involves the application of the procedural posture to the facts as pled. Even though we are in a context when particularized pleading is required, that does not mean that the plaintiffs must have conclusive proof of all their contentions. Instead, they must plead particularized facts that support a rational inference of non-exculpated breaches of fiduciary duty by a majority of the Duke Energy board.[108] Rarely will such evidence involve admissions by experienced managers and board advisors that the strategy they are undertaking involves a conscious decision to violate the laws, against the backdrop of a regulatory environment heavily influenced by the company's own lobbying and political contributions.

Unlike the majority and the Court of Chancery, I do not believe that the plaintiffs have to prove at this stage that there was collusion between a weak local regulator and Duke to avoid more searching scrutiny of its practices that pose a risk to the environment, wildlife, and public health. What they have to do is plead facts supporting an inference that Duke consciously was violating the law, taking steps that it knew were not sufficient to come into good faith compliance, but which it believed would be given a blessing by a regulatory agency whose fidelity to the law, the environment, and public health, seemed to be outweighed by its desire to be seen as protecting Duke and the jobs it creates.

---

[108] *E.g.*, *In re Cornerstone Therapeutics Inc.*, 115 A.3d 1173, 1175–76 (Del. 2015).

The pled facts that support this inference at this stage include:

- Duke's board knew that Duke illegally discharged highly toxic water from its coal ash ponds into the groundwater, sometimes intentionally through manmade channels,[109] in violation of both state and federal environmental law.[110] Duke's 760 daily violations of environmental regulations dated back to at least January 2012: the earliest time period from which the state regulator could assess liability under the statute of limitations.[111]

---

[109] App. to Opening Br. at 74–75 (Am. Compl. 38–39) (alleging that "Officer Defendant Keith Trent . . . in a presentation to Duke's Board of Directors on August 27, 2013," including seventeen of the defendants, "explained that 'seepage' was a 'necessary' aspect of the Company's ash ponds because the release of contaminated water was needed to "manage[] water pressure"); *id.* at 76–77 (Am. Compl. 40–41) (SELC identified instances of illegal seeps at the Riverbend Steam Station, and "[i]n some instances, Duke had even constructed so-called French drain structures to facilitate the flow of this contaminated water out of the coal ash ponds and into surrounding lakes and rivers. SELC tested some of this contaminated water and found it contained arsenic at twice the allowed level, cobalt at 52 times the allowed level, manganese at 128 times the allowed level and iron at 27 times the allowed level."); *id.* at 103–04 (Am. Compl. 67–68) (alleging that fourteen of the director defendants "knew that the Riverbend facility was literally flooding polluted coal ash water into North Carolina waterways at a rate of 4.9 million gallons per day" and that the director defendants "were told that the DEQ settlement [for Riverbend and Asheville] would only impose a $99,000 fine to help 'reinforce[]' the façade of a 'diligent prosecution' by DEQ, thereby preventing environmental groups from suing Duke to enforce the law").

[110] *Id.* at 91 (Am. Compl. 55) (Jeff Lyash, Executive Vice President, Energy Supply, explained at a meeting of the Regulatory Policy and Operations Committee "that the Company was violating state and federal laws by making unauthorized discharges of pollution into groundwater" and that by December 2012, after a presentation from the RPOC, twelve of the fifteen director defendants and three of the former director defendants "knew that: (i) Duke was in violation of the Clean Water Act and North Carolina state law; (ii) Duke's violations posed enormous threats to the Company, the environment and the health of North Carolina citizens; and (iii) 'third-party litigation' could bring the situation to a head by prosecuting Duke for its violations.").

[111] *Id.* at 110 (Am. Compl. 74).

- Duke knew its coal ash ponds were contaminating groundwater at illegal levels,[112] as confirmed by testing dating back to at least 2007 conducted by Duke itself, regulators, and environmental groups.[113]

- Duke's board knew that Duke had to procure discharge permits for its many coal ash ponds, but continued to operate them illegally and, in some cases, without any permit at all, in violation of state law and the Clean Water Act, even after trying, but failing, to secure a less restrictive type of permit.[114]

---

[112] *Id.* at 269 (Keith Trent, Environmental Review, Aug. 27, 2013, at 7) ("Groundwater (GW) monitoring has been conducted since 2007 or before with results submitted to state agencies; exceedances of certain GW standards at all ash ponds . . . Exceedances at most sites are for secondary (non health-based) standards; exceedances at some sites include primary (health-based) standards"); *id.* at 103–04 (Am. Compl. 67–68) (alleging that this presentation to the board "is direct evidence that these Director Defendants knew that Duke's earthen coal ash ponds were discharging polluted coal ash water in violation of the Clean Water Act").

[113] *Id.* at 75–79 (Am. Compl. 39–43) (describing Duke's finding in 2007 of exceedances at all of its ash ponds; state reports in 2009 and 2012 of exceedances at 13 and all 14 of Duke's active coal plants, respectively, in North Carolina; a county report in 2010 of exceedances of arsenic and zinc in Mountain Island Lake, Charlotte's main source of drinking water, near Duke's Riverbend facility; the 2013 reports of two environmental groups that Duke's ash ponds were illegally discharging contaminated water at a rate of 5 gallons per second, sometimes facilitated by drain structures Duke constructed; reports of contaminated groundwater at Duke's Dan River Station between 2011 and 2013, and at Duke's Asheville plant between 2010 and 2012; and DEQ's disclosure of the existence of violations at 14 Duke facilities).

[114] *Id.* at 89–90 (Am. Compl. 53–54) (summarizing articles from the *New York Times* and the *Charlotte Observer* reporting, based on internal DEQ emails, that "regulators knew as early as 2009 that power plants were operating without stormwater permits"; that "George Everett, Duke's director of environmental and legislative affairs, met with regulators to discuss the issue in 2011 and 2012" seeking a general landfill permit for its coal ash ponds, a less stringent permit, because it was not subject to the same extended comment period as stormwater permits; and that "[a]s a result of Duke's improper influence with DEQ, the issue was permitted to remain unresolved"); *id.* at 132 (Am. Compl. 96) (alleging that by as early as 2011, nine of the defendants "utterly failed

- Duke and its affiliated donors spent over $1.4 million dollars to influence its home state political process to secure the election of officials who would be lax in their enforcement of federal and state environmental laws that applied to Duke's operations,[115] including a Governor who had been a Duke employee for twenty-eight years.[116]

- Duke's board was aware of and supported the strategy to enlist the state regulator, which had done little to cause Duke to come into compliance with law in the past and which was now overseen by the Governor who had been a Duke employee for twenty-eight years and was supported by Duke in his campaign, to file complaints against Duke and thereby preempt the citizen suits that sought substantial remediation.[117] The regulator then

---

to implement a system to insure that the Company applied for proper permits for Duke's coal plants, let alone complied with the operational requirements governed by those permits").

[115] *Id.* at 94–97 (Am. Compl. 58–61) (alleging that new Governor Pat McCrory put in place policies to ease environmental regulation and appointed Duke employees to key posts, including the Commerce Secretary) (citing Michael Biesecker & Mitch Weiss, *The Big Story: NC Regulators Shielded Duke's Coal Ash Pollution*, ASSOCIATED PRESS, Feb. 9, 2014, http://bigstory.ap.org/article/nc-regulators-shielded-dukes-coal-ash-pollution (quoting Amy Adams, former DEQ regional director who resigned in protest in November 2013 as observing: "Under the new administration, North Carolina has changed the definition of who its customer is from the public and natural resources it is supposed to protect to the industries it regulates. There's been a huge push away from environmental protection toward promoting economic growth.")).

[116] *Id.*

[117] *Id.* at 97–98 (Am. Compl. 61–62) (alleging that "[t]he purpose of DEQ's suits was to permit Duke to continue to do business as usual and to block SELC from enforcing the Clean Water Act and requiring Duke to clean up its ash ponds. As reflected in Duke's Board materials, the Director Defendants were kept apprised every step of the way on how Duke was colluding with DEQ to abuse the protections afforded citizens under the Clean Water Act and to shield Duke from the consequences of its violations of the Clean Water Act.") (emphasis omitted).

proposed a consent order that involved a trifle of a civil penalty and that did not require remediation or a change in Duke's coal ash storage practices.[118]

- Four days after being court-ordered to immediately eliminate all sources of contamination from its coal ash ponds, Duke "was caught illegally and deliberately dumping toxic coal ash wastewater into the Cape Fear River, a practice that had been ongoing for several months and which resulted in 61 million gallons of wastewater discharged in the river."[119] Confronted with aerial photographs of this illegal activity, a Duke spokesman attributed the pumping to routine maintenance—an assertion rejected by

---

[118] *Id.* at 105 (Am. Compl. 69) (quoting the Chief of the EPA's Clean Water Enforcement Branch as stating to DEQ that "[t]he consent order's proposed penalty amounts for past violations . . . seems low considering the number of years these facilities are alleged to have been out of compliance). *Compare id.* at 244 (Lloyd Yates et al., Regulated Utilities Update, May 1, 2013, at 13) ("NC has initiated enforcement action against Asheville, which ordinarily deprives environmental groups of right to sue . . . We will be working with NC to resolve Asheville and hopefully address other plants at the same time. We do expect a civil penalty and compliance schedule of tasks, all of which constitute 'diligent prosecution' and bar the environmental groups' citizen suit.") *and id.* at 270 (Keith Trent, Environmental Review, Aug. 27, 2013, at 7) ("Following judicial approval, consent decree would resolve state enforcement litigation against Asheville and Riverbend . . . . $99K civil penalties for violations as of July 15, 2013 (reinforces diligent prosecution) . . . . Compliance schedule for further delineation") *with id.* at 100 (Am. Compl. 64) (noting that the proposed consent order assessed a $99,000 fine, $60,200 of which was for coal ash pollution at the Asheville site, but "did not include a mandate that the Company clean up the pollution or a requirement that the Company change how it stored toxic substances").

[119] *Id.* at 134 (Am. Compl. 98).

DEQ because the pumping activity "far exceeded what would reasonably be considered routine maintenance."[120]

As can be seen, in one respect, I share a key assumption with my colleagues in the majority. I do not rest my dissent on the notion that the board of Duke, under the pled facts, was ignorant of the company's practices. Sadly, my dissent rests on my reluctant conclusion that the facts as pled support a fair inference that the board was all too aware that Duke's business strategy involved flouting important laws, while employing a strategy of political influence-seeking and cajolement to reduce the risk that the company would be called to fair account.[121] Under the facts as pled, the only surprising thing about the Dan River spill that gave rise to the state regulator's issuance of a $6.8 million fine, twenty-three Notice of Violation letters, twenty-six Notice of Deficiency letters, and a finding that Duke committed more than 760 daily violations of environmental regulations, in addition to other severe civil and criminal penalties related to Duke's operations at other sites, is that

---

[120] *Id.* at 79–80 (Am. Compl. 43–44).

[121] My colleagues in the majority and I have a good faith disagreement about whether the board's knowledge, as pled in the complaint, is exculpatory under *Caremark*, their considered view, or in my view, whether that knowledge can and thus must be viewed with more suspicion. The complaint makes particularized allegations that it was a matter of public discussion for many years that Duke walked the line environmentally, that the Duke board knew that was the case and supported continuing that policy, and that the company engaged in extensive efforts to influence the political process to allow the company to escape the need to clean up its act. To my mind, on a motion to dismiss, the plaintiff is entitled to have rational inferences drawn in its favor, and I think it is at least rational to infer from these particularized facts that the Duke directors understood the company's policy was to skirt the environmental laws in pursuit of profits and to hope that they could get away with it by influencing regulators to ignore its non-compliance.

something like it did not happen years earlier.[122]  And the fact that the local regulator that had been so compliant and cooperative in shaping easy conditions for Duke that the plaintiffs from the environmental community Duke sought to avoid would not have accepted, so rapidly turned tail and ran in the face of public sentiment supports, rather than contradicts, the complaint's allegation that Duke knew it was dealing with a regulator that was not focused on its legal duties.  When the deal they cut was put under the spotlight of public scrutiny, its friendly regulator abandoned it, consistent with the behavior one would expect of a regulator that did not, let's say, run straight.  The company then experienced the predictable: the serious financial and reputational consequences that come when an offender is caught out, and those complicit in turning a blind eye to the past misbehavior tries to distance itself from responsibility by slapping its old buddy hard.

It may be that after the daylight of discovery shines for some time, the rancid whiff that arises from the pled facts dissipates and turns into the bracing freshness of a new Carolina day.  But, without that, the off-putting odor will linger and so too will rational suspicions that the defendants caused the smell.

---

[122] *Id.* at 108–123 (Am. Compl. 72–87).