**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

NATHAN A. COOK
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

August 31, 2023

Stephen E. Jenkins
F. Troupe Mickler IV
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

Andrew D. Cordo
Kaitlin E. Maloney
Lauren G. DeBona
Wilson, Sonsini, Goodrich & Rosati, P.C.
222 Delaware Avenue, Suite 800
Wilmington, DE 19801

William M. Lafferty
Kevin M. Coen
Courtney Kurz
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
Wilmington, DE 19801

RE: *Joel Newman v. KKR Phorm Investors, L.P., et al.*
C.A. No. 2022-0310-NAC

Dear Counsel:

This letter decision resolves Defendants' motions to dismiss under Court of

Chancery Rule 23.1.  For the reasons below, the motions are granted.[1]

## I.    FACTUAL BACKGROUND

I have drawn the relevant facts from the Verified Amended Stockholder

Derivative Complaint (the "Amended Complaint") and the documents incorporated

into and integral to it.  At this stage, I assume all well-pleaded allegations are true.

---

[1] This outcome moots Defendants' motions to dismiss for failure to state a claim.

**A.    The Parties**

Plaintiff is a stockholder of Transphorm, Inc. (the "Company").  During the relevant events, the seven individual defendants served on the Company's board of directors (the "Board").  Four of them simultaneously served on the Company's "Audit Committee" (together, the "Audit Committee Directors").[2]

Defendant KKR Phorm Investors, L.P. is the Company's largest stockholder. During the relevant events, KKR Phorm held up to 47.3% of the Company's stock. Under a stockholder agreement, KKR Phorm's percent ownership entitled it to seat a majority of the Board at any time.  Plaintiff does not allege that KKR Phorm ever invoked that right or threatened to use it.

**B.    The Policy**

The Board adopted a "Related Person Transactions Policy" (the "Policy"). The Policy applies to transactions involving the Company and a person that owns 5% or more of Company stock ("Related Person Transactions").[3]  The Policy delegates to the Audit Committee the power to review and approve or ratify Related Person Transactions.  "[T]o the extent relevant" to a given Related Person Transaction, the Audit Committee "will consider, among other factors":

---

[2] For the reasons below, the background to the remaining three directors is not relevant to my analysis.

[3] Ex. 3 to Dkt. 20 at § B(1)(b), (3) (cited as "Policy").

(i) whether the Related Person Transaction is fair to the Company and on terms no less favorable than terms generally available to an unaffiliated third party under the same or similar circumstances;

(ii) the extent of the Related Person's interest in the transaction;

(iii) whether there are business reasons for the Company to enter into the Related Person Transaction;

(iv) whether the Related Person Transaction would impair the independence of an outside director . . .; and

(v) whether the Related Person Transaction would present an improper conflict of interest for any director or executive officer of the Company, taking into account the size of the transaction, the overall financial position of the director, executive officer or Related Person, the direct or indirect nature of the director's, executive officer's or Related Person's interest in the transaction and the ongoing nature of any proposed relationship, and any other factors the Committee . . . deem[s] relevant.[4]

The Policy does not require the Audit Committee to review a Related Person

Transaction before the Board approves it:

A Related Person Transaction entered into without pre-approval will not violate this Policy . . . so long as the Related Person Transaction is brought to and ratified by the Committee . . . as promptly as reasonably practical after it is entered into or after it becomes reasonably apparent that the transaction is covered by this Policy.[5]

---

[4] *Id.* § D (enumeration reformatted).

[5] *Id.*

## C.    The Private Placement

In 2020, the Company set out to "up-list" itself from the OTC markets to NASDAQ. But it lacked the funds to get there. As of June 2021, the Company was $35 million short. And its cash had been burning quickly.

On September 1, 2021, the Board met to determine how to bridge the gap and mitigate an impending liquidity crisis. During the meeting, the Board discussed three fundraising transactions that were designed to solve both problems (the "September Transactions"). The September Transactions contemplated equity issuances at $5.00 per share, for a total cash infusion that would exceed the Company's short-term needs. Still, the Board believed that the Company could need to raise additional cash through "an offering" to "provide more leeway" into 2022.[6]

The September Transactions were expected to close by the end of the month. But that did not happen. As of October 2021, only one of the September Transactions closed. And the remaining two were uncertain to close. Consequently, the Company was still behind by at least $20 million. Worse, the Board learned that the Company "was expected to run out of cash" by December 2021.[7]

On November 1, 2021, the Board called a special meeting (the "November

---

[6] Ex. 5 (September 1, 2021 meeting slide deck). *See, e.g.*, Dkt. 15 ¶ 31 (referencing *id.*) (cited as "Am. Compl.").

[7] Am. Compl. ¶ 93 (quoting Ex. 6 to Dkt. 20 (November Meeting minutes)).

Meeting") to discuss an equity financing transaction "led by" an unaffiliated investor, AIGH Investment Partners (the "Private Placement").[8]  The Audit Committee Directors attended the November Meeting.  The Private Placement contemplated an equity issuance valued at $20 million or more.  The economics mirrored the September Transactions—*e.g.*, a per-share price of $5.00—and the deal would close before December.  Under the terms, KKR Phorm would invest $5 million and AIGH and third parties would supply the rest of the capital.  Otherwise, KKR Phorm is not alleged to have been treated differently than any other investor.

At the end of the November Meeting, the Board concluded that the Private Placement "was the best financing option for the Company under the circumstances and fair, just, equitable and reasonable to the Company and its stockholders."[9]  The Board implemented its fairness determination through a unanimous written consent approving the Private Placement (the "Written Consent").

Given its percent ownership, KKR Phorm's participation in the Private Placement brought KKR Phorm within the Policy.  The Written Consent separately declares that the Audit Committee approved KKR Phorm's participation "for purposes of the Policy":

---

[8] *Id.* ¶ 52 (quoting Ex. 6 to Dkt. 20 (November Meeting minutes)).
[9] *Id.* ¶ 59 (quoting Ex. 6 to Dkt. 20 (November Meeting minutes)).

**WHEREAS**, under the [Policy], KKR [Phorm], as a beneficial owner of more than 5% of the Common Stock, is a Related Person (as defined in the Policy) and KKR [Phorm's] participation in the Private Placement is a Related Person Transaction (as defined in the Policy).

**WHEREAS**, pursuant to the Policy, the Audit Committee must review and approve, ratify or disapprove all Related Person Transactions.

**WHEREAS**, the Audit Committee has reviewed with management the Private Placement, including the terms of KKR [Phorm's] participation therein.

**NOW, THEREFORE, BE IT RESOLVED**: That the Audit Committee hereby approves the Private Placement and the transactions contemplated thereby, including KKR [Phorm's] participation therein, for purposes of the Policy.[10]

The Private Placement closed before December 2021. Then the remaining September Transactions closed. The Company outpaced its cash burn, its stock price increased, and it began trading on NASDAQ in February 2022.

**D.    This Litigation**

Plaintiff brought this derivative suit without making a demand on the Board. The Amended Complaint alleges that the Board breached its fiduciary duties by approving the Private Placement. The Amended Complaint further alleges that KKR Phorm breached its fiduciary duties as the Company's "controller" by participating in the Private Placement. Defendants have moved under Rule 23.1 to dismiss the

---

[10] *Id.* ¶ 108 (quoting Ex. 8 to Dkt. 20 (Written Consent)).

Amended Complaint for failure to plead demand futility.

## II.   LEGAL ANALYSIS

"Stockholders cannot shortcut the board's control over the corporation's litigation decisions without first complying with Court of Chancery Rule 23.1."[11] Rule 23.1 is the "procedural embodiment" of the demand requirement.[12]  Under Rule 23.1, a derivative plaintiff must plead with factual "particularity" its efforts (or lack thereof) to satisfy the demand requirement.[13]  This standard is "stringent[.]"[14]  Under Rule 23.1, a derivative plaintiff is entitled only to "*reasonable* inferences" that "logically flow from [the] particularized facts alleged . . . . [I]nferences that are not objectively reasonable cannot be drawn in the plaintiff's favor."[15]

Where, as here, a stockholder forgoes demand, the complaint must be dismissed unless particularized facts support a reasonable inference of demand

---

[11] *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017). *See generally Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) ("A cardinal precept of [Delaware law] . . . is that directors, rather than [stock]holders, manage the business and affairs of the corporation." (citing 8 *Del. C.* § 141(a)) (subsequent history omitted)); *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981) (explaining that the board's authority to manage the corporation encompasses the power to decide whether the corporation should litigate a corporate claim).

[12] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993) (subsequent history omitted).

[13] Ct. Ch. R. 23.1(a).

[14] *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000).

[15] *Wood v. Baum*, 953 A.2d 126, 140 (Del. 2008) (emphasis in original) (internal quotation marks omitted).

futility. "Demand is not excused [as futile] solely because the directors would be deciding to sue themselves."[16] Instead, demand futility arises when "the directors are incapable of making an impartial decision" to pursue a corporate claim.[17] To determine if a conflict exists, the Court asks three questions:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that is the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[18]

"If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile."[19]

Although a plaintiff "is not required to plead evidence" to establish demand futility,[20] the Court cannot ignore the "evidence" that the plaintiff does plead. Plaintiff incorporated into the Amended Complaint books and records he obtained

---

[16] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009).

[17] *Stone v. Ritter*, 911 A.2d 362, 367 (Del. 2006).

[18] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021) (*Zuckerberg II*).

[19] *Id.*

[20] *Brehm*, 746 A.2d at 254.

from the Company under Section 220 of the Delaware General Corporation Law. Those documents, as well as any "public materials" referenced in the Amended Complaint, "necessarily shape the range" and "outcomes" of pleading-stage inferences.[21] On a Rule 23.1 motion, the Court may review an incorporated document as a whole "to ensure that the plaintiff has not misrepresented its contents and that any inference the plaintiff seeks to have drawn is a reasonable one."[22] When "a plaintiff chooses to refer to a [Section 220] document in its complaint, the Court may consider the entire document, even those portions not specifically referenced in the complaint."[23] "[A] complaint may, despite allegations to the contrary, be dismissed where the unambiguous language of documents upon which the claims are based contradict[s] the complaint's allegations."[24]

---

[21] *In re GGP, Inc. S'holders Litig.*, 282 A.3d 37, 54–55 (Del. 2022).

[22] *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016) (explaining, in the context of an agreement to incorporate Section 220 documents, that the incorporation-by-reference doctrine applies equally on Rule 23.1 review), *abrogated in part on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019).

[23] *Teamsters Loc. 677 Health Servs. & Ins. Plan v. Martell*, 2023 WL 1370852, at *8 (Del. Ch. Jan. 31, 2023) (internal quotation marks omitted) (declining to accept as true allegations based on mischaracterized and "cherry picked" Section 220 documents). *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) ("A plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms." (cleaned up)).

[24] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 139 (Del. Ch. 2003) (citing *In re Wheelabrator Techs. Inc. S'holders Litig.*, 1992 WL 212595, at *3 (Del. Ch. Sept. 1, 1992); and *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)); *see also GGP*, 282 A.3d at 54 n.84 ("Delaware's system affirmatively encourages reliance on factually specific

Against this background, I turn to Defendants' motions. As noted above, the demand board comprised seven directors, including the four Audit Committee Directors. The parties therefore focus solely on the Audit Committee Directors. Plaintiff argues that the Audit Committee Directors could not have impartially considered a demand because they (i) lack independence from KKR Phorm, which is alleged to control the Company; and (ii) face a substantial likelihood of liability for bad faith. Neither theory excuses demand here.

**A.    The Amended Complaint Fails To Allege With Particularity That The Audit Committee Directors Lack Independence.**

Demand will be excused as futile if the Audit Committee Directors lack independence from KKR Phorm, a person that received a material personal benefit from the challenged conduct. Defendants contend that the Amended Complaint fails to allege with particularity the Audit Committee Directors' lack of independence from KKR Phorm. I agree.

---

pleadings as a basis for substantive evaluation of shareholder litigation at an early stage of the proceedings . . . . [T]he Delaware system provides or depends on mechanisms that enable and encourage the plaintiff and the defendants as well to supply relevant information that meaningfully assists the courts in improving the fairness and utility of that substantive, pleading stage evaluation." (quoting Lawrence A. Hamermesh & Michael L. Wachter, *The Importance of Being Dismissive: The Efficiency Role of Pleading Stage Evaluation of Shareholder Litigation*, 42 J. Corp. L. 597, 603 (2017))); *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *3–4 (Del. Ch. Feb. 21, 2014) (explaining the "public policy" objectives achieved by the incorporation-by-reference doctrine, which include pleading-stage efficiency).

Directors are presumed to be independent.[25] To rebut that presumption, a plaintiff must allege particularized facts supporting a reasonable inference that the director's "ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party."[26] Put differently, the facts must suggest that the interested party's influence over the director effectively would "sterilize[]" the director's ability to judge on the merits a matter involving the interested party.[27] Because a director's dependence on an interested party is a context-specific inquiry, the plaintiff must offer "'particularized facts . . . about the relationships between the director and the interested party[.]'"[28]

The Amended Complaint fails to rebut the presumption of independence. The Amended Complaint alleges no facts suggesting that KKR Phorm "controlled" the

---

[25] *See, e.g.*, *Beam v. Stewart*, 845 A.2d 1040, 1048–49 (Del. 2004).

[26] *Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016).

[27] *Zuckerberg II*, 262 A.3d at 1060 (internal quotation marks omitted). *See In re Books-A-Million, Inc. S'holder Litig.*, 2016 WL 5874974, at *9 (Del. Ch. Oct. 10, 2016) ("To plead that a director is not independent . . . a plaintiff must allege facts to supporting a reasonable inference that a director is sufficiently loyal to, beholden to, or otherwise influenced by an interested party so as to undermine the director's ability to judge the matter on the merits."), *aff'd*, 164 A.3d 56 (Del. 2017) (TABLE).

[28] *SDF Funding LLC v. Fry*, 2022 WL 1511594, at *12 (Del. Ch. May 13, 2022) (quoting *Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015)). *See also Marchand v. Barnhill*, 212 A.3d 805, 818 (Del. 2019) ("[T]he plaintiff cannot just assert that a close relationship exists[.]").

Audit Committee Directors or "dominated" them through a "close relationship" or "force of will."[29] Nor does the Amended Complaint allege particularized facts from which to reasonably infer KKR Phorm's participation in the Private Placement was of "subjective material importance" to the Audit Committee Directors or otherwise suited their personal interests.[30] To the contrary, the Amended Complaint gives generic biographical information about the Audit Committee Directors and otherwise group-pleads allegations against them. It fails to discuss any of their ties to KKR Phorm or their individual motivations for approving the Private Placement.[31]

To contend otherwise, Plaintiff observes that KKR Phorm has the voting power to remove the Audit Committee Directors from the Board.[32] Via that power, Plaintiff portrays KKR Phorm as the Company's controller. Plaintiff in turn

---

[29] *Orman v. Cullman*, 794 A.2d 5, 25 n.50 (Del. Ch. 2002) (Chandler, C.) (describing circumstances under which a director might be considered "controlled" by an interested party); *accord In re Kraft Heinz Co. Deriv. Litig.*, 2021 WL 6012632, at *6 (Del. Ch. Dec. 15, 2021), *aff'd*, 282 A.3d 1054 (Del. 2022) (TABLE).

[30] *Orman*, 794 A.2d at 25 n.50 (describing circumstances under which a director might be considered "beholden to (and thus controlled by)" an interested party); *accord Zuckerberg II*, 262 A.3d at 1061; *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 649 (Del. 2014), *overruled in part on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018).

[31] *See, e.g.*, *Citigroup*, 964 A.2d at 121 n.36 (rejecting a "group accusation mode of pleading demand futility" as no substitute for "individualized" allegations "as to each" director); *see Zuckerberg II*, 262 A.3d at 1059–61 (requiring a context-specific analysis of the directors' individual relationships with the allegedly interested party, because the Court must "count heads" in determining a lack of independence).

[32] *See* Dkt. 28 at 29–34.

suggests that KKR Phorm's alleged controller status is sufficient to impugn the Audit Committee Directors' independence.[33]  It is not.

The mere presence of a controller generally does not, "by itself, excuse demand."[34]  "Instead, there must be coupled with the allegation of control such facts as would demonstrate that . . . the directors are *beholden* to the controlling person."[35]  Based on this framework, precedent has recognized that "a controlling stockholder's voting power and 'selection' of directors do not, without more, render directors 'beholden' to the controller."[36]  That precedent has special force where, as here, the

---

[33] Defendants have persuasively argued that KKR Phorm is not a controller.  For the reasons below, demand would not be excused even if it were a controller.

[34] *In re Vaxart, Inc. S'holder Litig.*, 2021 WL 5858696, at *18 (Del. Ch. Nov. 30, 2021). *See, e.g.*, *In re Martha Stewart Living Omnimedia, Inc. S'holder Litig.*, 2017 WL 3568089, at *21 (Del. Ch. Aug. 18, 2017) ("Our Supreme Court has made clear . . . that 'proof of majority ownership does not strip . . . directors of the presumption[] of independence.'" (quoting *Aronson*, 473 A.2d at 815)).

[35] *Kraft Heinz*, 2021 WL 6012632, at *6 (emphasis added) (alteration and internal quotation marks omitted).  *Accord Beam*, 845 A.2d at 1054 ("A stockholder's control of a corporation does not excuse presuit demand on the board without particularized allegations of relationships between the directors and the controlling stockholder demonstrating that the directors are beholden to the stockholder."); *see also, e.g.*, *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 67 (Del. Ch. 2015) ("[T]he demand futility analysis focuses on whether there is reason to doubt the impartiality of the directors . . . . [So] neither the presence of a controlling stockholder nor allegations of self-dealing by a controlling stockholder changes the director-based focus of the demand futility inquiry."); *accord Lenois v. Lawal*, 2017 WL 5289611, at *13 & n.103 (Del. Ch. Nov. 7, 2017) (Montgomery-Reeves, V.C.).

[36] *In re GoPro, Inc. S'holder Deriv. Litig.*, 2020 WL 2036602, at *11 (Del. Ch. Apr. 28, 2020) (alteration omitted) (quoting *Beam*, 845 A.2d at 1058) (rejecting lack of independence argument where plaintiffs alleged, without more, that the interested party controlled "over 75% of the voting power" and "could remove any director who voted

alleged controller owns less than 50% of the voting stock.[37]  Under the traditional formulation, a stockholder that owns less than 50% of the voting stock is not a controller unless it exercises "actual control" over the corporation's affairs or "with regard to the particular transaction that is being challenged."[38]  Either way, the "*potential* ability to exercise control is not sufficient."[39]

Here, as discussed, Plaintiff has not alleged with particularity that the Audit Committee Directors are beholden to KKR Phorm.  Its potential power to remove those directors—which was never invoked or threatened to be used—is no substitute. Accordingly, demand is not excused due to a lack of independence.

---

against his interests"). *Accord Martha Stewart*, 2017 WL 3568089, at *21 ("In considering whether demand on the board [is] excused in the derivative suit context, this court has held that the controller's ability to remove or replace directors does not, by itself, demonstrate a capacity to control them absent "allegations that remaining on the board is material to the . . . directors . . . ." (second omission in original) (alteration omitted) (quoting *Beam v. Stewart*, 833 A.2d 961, 978 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004))).

[37] Plaintiff alleged that KKR Phorm held more than 50% of the Company's stock "at all relevant times[.]"  Am. Compl. ¶ 23.  The Company's public disclosures, however, flatly refute that allegation.  *See* Ex. 2 (Transphorm, Inc., Current Report (Form 8-K) (Nov. 5, 2021) (reporting that, immediately prior to the Private Placement, KKR Phorm held "47.3%" of the Company's stock).

[38] *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014) (internal quotation marks omitted), *aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).  *See Kahn v. Lynch Commc'n Sys.*, 638 A.2d 1110, 1113–14 (Del. 1994).

[39] *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *26 (Del. Ch. July 6, 2018) (emphasis in original) (internal quotation marks omitted), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019) (TABLE). *Accord Thermopylae Cap. P'rs, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *13 (Del. Ch. Jan. 29, 2016).

**B.     The Amended Complaint Fails To Allege With Particularity That The Audit Committee Directors Face A Substantial Likelihood Of Liability.**

Demand will be excused as futile if the Audit Committee Directors face a substantial likelihood of liability on the claims alleged against them.  The Company's charter exculpates directors "to the fullest extent permitted by" Delaware law.[40]  So the Audit Committee Directors cannot face a substantial likelihood of liability unless particularized facts support a reasonable inference that they "harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith."[41]

Plaintiff does not allege that the Audit Committee Directors were personally interested in the Private Placement.  And I have concluded that the Amended Complaint fails to undermine their independence.  That leaves bad faith.

"This Court has held on numerous occasions that to state a bad-faith claim, a plaintiff must show either [(i)] an extreme set of facts to establish that disinterested directors were intentionally disregarding their duties or [(ii)] that the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially

---

[40] Ex. 9 to Dkt. 20 at art. IX § 1 (Charter).

[41] *In re Cornerstone Therapeutics, Inc. S'holder Litig.*, 115 A.3d 1173, 1179–80 (Del. 2015).

inexplicable on any ground other than bad faith."[42]  "That is, the facts must be sufficiently egregious that, despite lack of self-interest or dependence on any interested party, a court may find . . . that the fiduciary was acting against the interest of the entity."[43]  "Crucially, bad faith requires a showing that 'the directors acted with scienter, meaning they had actual or constructive knowledge that their conduct was legally improper.'"[44]  "[T]here is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties."[45]

The Amended Complaint fails to reach this high standard.

### 1.    The Allegation That The Policy Was "Disregarded"

As its principal bad faith theory, the Amended Complaint alleges that the Audit Committee Directors "disregarded" the Policy.[46]  The Section 220 documents contradict that allegation.  Cited in the Amended Complaint, the Written Consent

---

[42] *In re MeadWestvaco S'holders Litig.*, 168 A.3d 675, 684 (Del. Ch. 2017) (internal quotation marks omitted).

[43] *Ligos v. Tsuff*, 2022 WL 17347542, at *9 (Del. Ch. Nov. 30, 2022).

[44] *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *11 (Del. Ch. Mar. 19, 2018) (quoting *Good*, 177 A.3d at 55).  *See In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006).

[45] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009).

[46] Am. Compl. ¶¶ 81–84.

first declares that the Audit Committee "reviewed" the Policy.[47]   Cited in the Amended Complaint, the Written Consent next declares that the Audit Committee considered "the terms of KKR [Phorm's] participation in" the Private Placement.[48] Cited in the Amended Complaint, the Written Consent finally declares that the Audit Committee "approve[d]" KKR Phorm's participation "for purposes of the Policy."[49] Based on the Amended Complaint itself, it would be objectively unreasonable to infer that the Audit Committee Directors failed to consider the Policy.  So I will not.

In opposition, Plaintiff raises two arguments that, to my ear, sound like hairsplitting.  Plaintiff primarily argues that the Audit Committee Directors did not "scrupulously follow" the Policy because the Written Consent does not name each factor.[50]   But the Policy is not a checklist.  It requires the Audit Committee to "consider" the factors—not recite them—and even then, "to the extent relevant" to the transaction.[51]  Given this latitude, it would be unreasonable to conclude that the Policy mandates the box-ticking exercise Plaintiff deems indispensable.[52]

---

[47] Ex. 8 (Written Consent).

[48] *Id.*

[49] *Id.*

[50] Dkt. 28 at 24–28.

[51] Policy § D.

[52] As Defendants point out, the November Meeting minutes and materials do encompass the relevant factors anyway.  *Compare id.* (The Audit Committee will consider, among other things, fairness to the Company, whether the terms are arm's-length, the extent of the

It also would be unreasonable to analogize these facts to *Walmart*,[53] but Plaintiff tries anyway. Plaintiff suggests *Walmart* supports a conclusion that the November Meeting minutes' failure to record a mechanical progression through *each* Policy factor means the Audit Committee did not actually consider *any* factor.

This case is nothing like *Walmart*. The complaint in *Walmart* well-pleaded a *Caremark* claim based on the board's multi-year-long conscious disregard of concrete obligations imposed under a settlement resolving a criminal investigation. The board's alleged decision to ignore clear red flags surrounding the company's non-compliance led the court to credit a pleading-stage inference that no discussions occurred at the board level about the company's alleged non-compliance.

Here, by contrast, the November Meeting minutes reflect that the Board did discuss KKR Phorm's participation in the Private Placement. The Audit Committee Directors attended the November Meeting, then approved KKR Phorm's participation under the Policy. So the only reasonable inference available here is that the Audit Committee Directors reviewed KKR Phorm's participation during the

---

Related Person's interest, and the Company's business reasons for entering the Related Person Transaction), *with* Dkt. 6 (November Meeting minutes), *and* Ex. 7 (November Meeting slide deck).

[53] *Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 2023 WL 3093500 (Del. Ch. Apr. 26, 2023).

November Meeting.[54]   Unlike the *Walmart* complaint, the Second Amended

Complaint does not support a reasonable inference of a conscious disregard or that

"no discussion"[55] of the Policy occurred.[56]

---

[54] Indeed, the Board made a unanimous fairness determination in this case.  *See* Am. Compl. ¶ 59 (quoting Ex. 6 to Dkt. 20 (November Meeting minutes)).  And a fairness determination is a "factor" outlined in the Policy.  Policy § D (The Audit Committee will consider "whether the Related Person Transaction is fair to the Company[.]"); *see also supra* note 52.

[55] Am. Compl. ¶¶ 83–84.

[56] *See* Ex. 6 (November Meeting minutes) ("The Board asked questions [about the Private Placement] throughout the presentation, and a discussion ensued.  Following the discussion, the Board" made its fairness determination.).

As discussed, the Policy, unlike the *Walmart* settlement, does not impose mandatory obligations and is otherwise not well-pleaded to create additional or new fiduciary duties. Indeed, it is not clear to me whether a failure to follow the Policy would even give rise to fiduciary liability, let alone liability for bad faith.  *See, e.g.*, *In re MetLife Inc. Deriv. Litig.*, 2020 WL 4746635, at *15 (Del. Ch. Aug. 17, 2020) ("Additionally, the Plaintiffs put great weight on the Company's codes of conduct and the [] committee charters to argue that various directors should have had knowledge or should have reported to the full Board, based on their tasked oversight. As numerous Delaware decisions make clear, [however,] an allegation that the underlying [problem] falls within the delegated authority of a board committee does not support an inference that the directors on that committee knew of and consciously disregarded the problem for purposes of Rule 23.1." (emphases and internal quotation marks omitted) (collecting authority)); *Citigroup*, 964 A.2d at 135 ("Although the members of the ARM Committee were charged with reviewing and ensuring the accuracy of [] financial statements under the ARM Committee charter, director liability is not measured by the *aspirational standard* established by the internal documents detailing a company's oversight system . . . . [P]laintiffs [instead] must show . . . bad faith." (emphasis added)); *see also Baiera*, 119 A.3d at 57–58 (rejecting as "hyper-technical and unreasonable" and an "unsupported leap of logic" the plaintiff's argument that the power to "negotiate" a transaction did not fall within the committee's authority under an identical related person transaction policy simply because the policy did not specifically use the word "negotiate" (citing *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 764 (Del. Ch. 2005))); *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 595 n.88 (Del. Ch. 2007) ("The complaint does allege that an independent committee met only once a year,

The *Walmart* detour eventually leads to Plaintiff's alternative argument. Plaintiff claims the Board's minutes and the Written Consent must be "false"[57] because the Section 220 documents he obtained do not include a record of a meeting during which the Audit Committee reviewed the Policy.[58]  But that conclusion does not "logically flow" from the Amended Complaint.[59]  Again, the Section 220 documents confirm that the Audit Committee Directors attended the November Meeting, reviewed the Policy, and approved KKR Phorm's participation under the Policy.  So there *is* a record of their review and approval.

Read charitably, this allegation might have been understood to suggest that the Audit Committee was required to conduct a meeting *separate* from the November Meeting to validly review KKR Phorm's participation under the Policy. But Plaintiff has abandoned that idea.  At oral argument, Plaintiff's counsel

---

despite requirements in their charter that they meet more often.  This is not enough for a court to infer, however, that the transactions were given only cursory review.  A decision to change the scheduling of meetings does not require the conclusion that those meetings were ineffective or that the directors in attendance were insincere.").

[57] Am. Compl. ¶¶ 97, 108.

[58] Dkt. 28 at 26.

[59] *Wood*, 953 A.2d at 140 (a complaint may be dismissed if a plaintiff seeks objectively unreasonable inferences).  *See also White v. Panic*, 783 A.2d 543, 549 n.12 (Del. 2001) ("In [the Rule 23.1] context, 'well-pleaded allegations' include specific allegations of fact and conclusions supported by specific allegations of fact.").

conceded that a separate meeting is not required.[60] Counsel also conceded that the Policy does not outline a "set procedure for the Audit Committee to discharge its . . . obligations."[61] Both concessions track the Policy's language, which provides that the Audit Committee does not "violate" the Policy if it does not review a Related Person Transaction before the Board approves it.[62]

Although plaintiff-friendly, pleading stage standards "do[] not give this court license to conjure up a reality on behalf of the plaintiff[.]"[63] Offered only speculation and innuendo, I decline to infer, as Plaintiff apparently would, that minutes and records memorializing the meetings and decisions of a public company's board of directors "were contrived as part of what amounts to a grand conspiracy" simply because those documents defeat Plaintiff's theory of bad faith.[64]

---

[60] Dkt. 44 at 39:5–6 (Tr. of Oral Arg. Regarding Defs.' Mots. to Dismiss).

[61] *Id.* at 38:12–14.

[62] Policy § D.

[63] *Morgan v. Cash*, 2010 WL 2803746, at *7 (Del. Ch. July 16, 2010) (Strine, V.C.).

[64] *Martell*, 2023 WL 1370852, at *17 (rejecting, under similar circumstances, a claim that the books and records of a public company were false simply because they did not support the plaintiff's theory of the case). *Accord Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988) ("A trial court need not blindly accept all allegations as true . . . .") (subsequent history omitted); *see also Brehm*, 746 A.2d at 255 (Rule 23.1 "does not permit a stockholder to cause the corporation to expend money and resources in discovery and trial in the stockholder's quixotic pursuit of a purported corporate claim based solely on conclusions, opinions or speculation.").

## 2. The Allegation Concerning "MNPI"

The Amended Complaint next alleges that the Audit Committee Directors approved the Private Placement in bad faith because KKR Phorm's $5 million investment does not reflect the value of purported "material non-public information" ("MNPI") it received in connection with the Private Placement. In other words, Plaintiff complains that an alleged controller received the same terms given to every unaffiliated investor, even though there could have been a basis for the Board to prefer the controller or for the controller to coerce preferential terms. That is somewhat counterintuitive, because arm's-length dealing with an alleged controller traditionally is considered "strong evidence" of an entirely fair transaction.[65]

Even so, Plaintiff's MNPI allegation amounts to an attempt to inject into the demand futility analysis a transactional standard of review as a surrogate for particularized factual allegations addressing the question of whether the Audit Committee Directors face a substantial likelihood of liability for bad faith. The prospect of entire fairness review is not a "proxy for whether directors face a

---

[65] *See, e.g.*, *In re Tesla Motors, Inc. S'holder Litig.*, --- A.3d ----, 2023 WL 3854008, at *21 (Del. June 6, 2023) ("This Court has held that arm's-length negotiation provides strong evidence that the transaction meets the test of fairness." (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1172 (Del. 1995))). The Policy agrees. *See* Policy § D (The Audit Committee will consider "whether the Related Person Transaction is . . . on terms no less favorable than terms generally available to an unaffiliated third party under the same or similar circumstances[.]").

substantial likelihood of liability[.]"[66] "[R]egardless of the underlying standard of review," the Amended Complaint cannot clear Rule 23.1 on these facts without a viable claim for bad faith.[67]

There is none here. With some straining, the Amended Complaint could perhaps support an inference that the Board could have used KKR Phorm's possession of MNPI to bargain harder against KKR Phorm. As explained, however, "[a]llegations that the Board should have done more under the circumstances are not enough to raise a bad faith claim."[68] Even if ill-considered, KKR Phorm's participation in the Private Placement on the same terms as all the other participants is not so egregious or extreme as to suggest bad faith.

### 3. The Allegation Concerning Dilution

The Amended Complaint last alleges that the Audit Committee Directors acted in bad faith by allowing KKR Phorm to participate at all. In Plaintiff's view, the Company did not truly need KKR Phorm's $5 million investment because the September Transactions alone were sufficient to address the Company's cash deficit.

---

[66] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 250 A.3d 862, 881–86 (Del. Ch. 2020) (*Zuckerberg I*), *aff'd*, 262 A.3d 1034 (Del. 2021).

[67] *Cornerstone*, 115 A.3d at 1175.

[68] *In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *8 (Del. Ch. Jan. 3, 2013) ("Bad faith is also not shown by disagreement with the Board's decisions . . . .").

Based on this framing of the Company's outlook, Plaintiff suggests the "real reason" behind the Private Placement was to prevent dilution of KKR Phorm's ownership.

Plaintiff inspected the Company's books and records before filing this action. Those documents are integral to the Amended Complaint.[69] Those documents indicate, as the Amended Complaint observes, that the Board sought to address exigent liquidity issues and the Company's goal of up-listing itself. To achieve those objectives, the Board approved the September Transactions.

Still, the Board concluded that the Company could need to raise additional cash through "an offering" to "provide more leeway" into 2022.[70] The Board pursued that option—the Private Placement—when all the September Transactions did not close as planned. The "leeway" afforded under the Private Placement (which was contemplated months before the November Meeting) accounted for KKR Phorm's investment.[71] And third parties, not KKR Phorm, "led" the negotiation of

---

[69] *See Gardner Denver*, 2014 WL 715705, at *3 ("[T]he Court may conclude a document is integral to the claim if it is source for the facts as pled in the complaint." (cleaned up)). Plus, Defendants rely on these documents liberally and Plaintiff has not argued that my consideration of them would be inappropriate.

[70] Ex. 5 (September 1, 2021 meeting slide deck). *See, e.g.*, Am. Compl. ¶ 31 (referencing *id.*).

[71] Ex. 7 (November Meeting slide deck). *See, e.g.*, Am. Compl. ¶ 93 (referencing *id.*).

the terms governing KKR Phorm's participation.[72]   Those terms required KKR Phorm to participate at arm's-length, *i.e.*, as if it were not an alleged controller.

Given all this, it would be unreasonable to conclude that KKR Phorm's investment was gratuitous or a ruse solely to maintain KKR Phorm's voting power. Yet, Plaintiff insists, without any books-and-records support, that the Audit Committee Directors approved the Private Placement solely to appease an alleged controller.  The Amended Complaint itself forecloses that conclusion.

Shorn of the words "bad faith," Plaintiff's arguments reduce to a critique of the Private Placement.  But his disagreement with the Audit Committee does not mean the Audit Committee Directors acted in bad faith.[73]  It means he has failed to allege that demand is excused due to a substantial likelihood of liability. Accordingly, the Amended Complaint must be dismissed.

---

[72] Am. Compl. ¶ 52 (quoting Ex. 6 to Dkt. 20 (November Meeting minutes)).

[73] *See, e.g.*, *Simons v. Brookfield Asset Mgmt. Inc.*, 2022 WL 223464, at *13 (Del. Ch. Jan. 21, 2022) ("Plaintiff's allegations simply register disagreement with the [transaction], but mere disagreement does not give rise to a substantial likelihood of liability for disloyalty or bad faith." (citing *Zuckerberg I*, 250 A.3d at 897)); *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *23 (Del. Ch. Oct. 24, 2014) ("Mere disagreement with the Board's ultimate decision to enter into a [transaction] . . . does not show bad faith by the Board members."); *see generally City of Coral Springs Police Officers' Pension Plan v. Dorsey*, 2023 WL 3316246, at *1 (Del. Ch. May 9, 2023) ("Under Delaware law . . . a board comprised of a majority of disinterested and independent directors is free to make a terrible business decision without any meaningful threat of liability, so long as the directors approve the action in good faith.").

## III.   CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss under Rule 23.1 are granted.

Sincerely,

*/s/ Nathan A. Cook*

Vice Chancellor